**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**JANE KAWIRA NAIVASHA,**
     **Kerarapon Drive**
     **Kajiado West**
     **Kajiado County, Kenya**

**ODILLIA MUTAKA MWANI,**
     **Kajiado Ongata**
     **Rongai, Kenya**

**NOAH THUO KIMANI,**
     **Kangema - Kiria-ini Road**
     **Kangema, Murang'a County**
     **Central Kenya, Kenya**

**AGNES MUTHONI KAMBO,**
     **Oasis Gardens Estate**
     **New Valley, Deliverance Road**
     **Kitengela Town, Kajiado East**
     **County**
     **Kenya**

**ALICE N. MACHARIA,**            **Civil Action No.:**
     **Gathima Estate**
     **Juja, Muigai**
     **Kiambu County, Kenya**

**ANNE FAITH MUTHONI NGECHE**
     **Haven Apartments**
     **Kenyatta Road**
     **Kiambu County, Kenya**

**CASTRO OTIENDE**
     **Hillside Area, Kiembeni Estate**
     **Bamburi, Kiembeni Road**
     **Mombasa City, Kenya**

**CHARLES MAKORI MOGI**
     **Giraffe Sanctuary**
     **Tumbili Road, Karen**
     **Nairobi, Kenya**

1

**COSMAS KANGORI NKONGE**
    **Forest Court, Plot Number 44**
    **Membly Estate, Ruiru**
    **Kiambu County, Kenya**

**DIPAK L. SHAH**
    **B4-4 Crescent Gardens**
    **Crescent Road, Parklands**
    **Nairobi, Kenya**

**ELIJAH MUTIE**
    **12417 W 120th Street, Apt 826**
    **Overland Park, KS 66213**

**ELIZABETH MUTHONI WANYOIKE**
    **Major Wanyoike's Home**
    **Riu Nderi Village, Gikambura**
    **Kiambu County, Kikuyu**
    **Kenya**

**EMMANUEL KIOKO MUEMA**
    **Mukuyuni**
    **Kyamuthei Road**
    **Makueni County, Kenya**

**FRIDA NAMENGE ODAYA**
    **House Number 190**
    **Tsavol Lane, Valley View Park**
    **Estate Mlolongo**
    **Mombasa Road, Kenya**

**GEORGE N. S. NJOROGE**
    **Kerwa, Kanduma Area**
    **Kanyanjara Nduma Road**
    **Kiambu County, Kenya**

**JANE ACHIENG OKWAMA**
    **New Hurlingham Estate**
    **Miami Court, Chokaa**
    **Nairobi, Kenya**

**JOYCE MUMBI MUASYA KITUKU**
    **Kituku Residence**

**Mukuyuni, Kaiti**
**Makueni County, Kenya**

**JUDITH KYALO**
      **Suncity Court, Obama Estate**
      **Kangundo Road**
      **Nairobi, Kenya**

**JULIE OGOYE**
      **Kenua Re Garden Estate, South C**
      **Block 4, Door 3**
      **Nairobi, Kenya**

**JULIUS KOOM MARANGU**
      **Katheri**
      **Meru County, Kenya**

**JUSTUS KIMATHI MITILI**
      **Muringa Grove Apartment C1**
      **Muringa Road, Kilimani**
      **Nairobi, Kenya**

**PATRICK WANJALA BARASA**
      **NHC Langata Estate**
      **Block 29, House 281**
      **Nairobi, Kenya**

**PHILIP KYALO MAUYU**
      **Machakos Wote Road**
      **Mukuyuni Market, Ukia**
      **Makueni County, Kenya**

**PHILIP MURIITHI MWAI**
      **Dagoretti/Ruthimitu 1058/15**
      **Wangai Road off Muhuri Road**
      **Nairobi County, Kenya**

**PHILLIP KANIARU GITAHI**
      **Gatumbiro Village**
      **Tetu West Sub County, Nyeri County**
      **Kenya**

**PROTUS BULUMA**
>   **Syekunya Village**
>   **Nambale-Busibwabo Road**
>   **Nambale, Busia County**
>   **Kenya**

**RICHARD MAINA**
>   **Naivasha Road**
>   **Maisha   Poa,   Dagoreti   South Division**
>   **Nairobi, Kenya**

**ROSE WANJIRU NJOROGE**
>   **Kamiti Road**
>   **Zimmerman, Roysambu**
>   **Nairobi, Kenya**

**SUSAN WAIRIMU KIMEMIA**
>   **Estate Section 58**
>   **Nakuru Town, Nakuru East**
>   **Nakuru County, Kenya**

**VICTORIA MUTUKU**
>   **Kush Apartment, House No. B4**
>   **5th   Parklands   Avenue,   Mtama Road**
>   **Nairobi, Kenya**

**WILFRED NDERITU**
>   **50 Chui Drive**
>   **Mūthithi   Gardens,   Njathainī Road**
>   **Kenya**

**MARGARET MUSOKE WAGABI**
>   **Accra Road**
>   **Kibiko, Ngong**
>   **Kajiado County, Kenya**

**ISAAC KABENGI NDAMBIRI**
>   **Rwathia Village**
>   **Kianyaga Town, Kirinyaga East**
>   **Kirinyaga County, Kenya**

**NANCY AMWOSO ASWANI**
  **18th Drive, Gate 2 Kangawa Road**
  **Ngong, Kenya**

**JOHN CHEGE**
  **Rwathia**
  **Kiawambogo, Karima**
  **Kangema, Muranga County**
  **Kenya**

**ANNE GACHARA**
  **Hurligham Grove**
  **Kilimani**
  **Nairobi, Kenya**

**STEPHEN KAIRU MAINA**
  **Ruai Estate, Kangundo Road**
  **Nairobi, Kenya**

**AND**

**SHEILA MWENDE KALISA**
  **House No. 304, G Flats**
  **Mukoma Street, South B**
  **Nairobi, Kenya**

  **Plaintiffs,**
**v.**

**THE ISLAMIC REPUBLIC OF IRAN**
  **The Ministry of Foreign Affairs**
  **Imam Khomeini Street**
  **Imam Khomeini Square**
  **Tehran, Iran**
  **1136914811**

**THE ISLAMIC REVOLUTIONARY GUARD CORPS**
  **Armed Forces Headquarters Iran**
  **Tehran – Zone 7 – Shariati**
  **Ghoddoosi Square (Ghaar)**
  **Tehran, Iran**

**AND**

IRANIAN            MINISTRY            OF
INTELLIGENCE & SECURITY
        (A/K/A    Vexarat-e    Ettela'at    Va
        Amniat-e Keshvar A/K/A VEVAK
        A/K/A VAJA)
        Second Negarestan Street
        Pasdaran Avenue
        Tehran, Iran

        Defendants.

## COMPLAINT

COME NOW Plaintiffs, Jane Kawira Naivasha, Odillia Mutaka Mwani, Noah Thuo Kimani, Agnes Muthoni Kambo, Alice N. Macharia, Anne Faith Muthoni Ngeche, Castro Otiende, Charles Makori Mogi, Cosmas Kangori Nkonge, Dipak L. Shah, Elijah Mutie, Elizabeth Muthoni Wanyoike, Emmanuel Kioko Muema, Frida Namenge Odaya, George N. S. Njoroge, Jane Achieng Okwama, Joyce Mumbi Muasya Kituku, Judith Kyalo, Julie Ogoye, Julius Koom Marangu, Justus Kimathi Mitili, Patrick Wanjala Barasa, Philip Kyalo Mauyu, Philip Muriithi Mwai, Phillip Kaniaru Gitahi, Protus Buluma, Richard Maina, Rose Wanjiru Njoroge, Susan Wairimu Kimemia, Victoria Mutuku, Wilfred Nderitu, Margaret Musoke Wagabi, Isaac Kabengi Ndambiri, Nancy Amwoso Aswani, John Chege, Anne Gachara, Stephen Kairu Maina, and Sheila Mwende Kalisa (collectively "Plaintiffs"), by and through undersigned counsel, and, pursuant to Fed. R. Civ. P. 7, and as a cause of action against Defendants, the Islamic Republic of Iran ("Iran"), the Islamic Revolutionary Guard Corps ("IRGC"), the Iranian Ministry of Intelligence & Security (A/K/A Vexarat-e Ettela'at Va Amniat-e Keshvar A/K/A VEVAK A/K/A VAJA) ("MOIS") (collectively "Defendants"), aver as follows:

## JURISDICTION

1. Subject matter jurisdiction in this Court arises pursuant to 28 U.S.C. § 1330(a), 1330(b), 1331, 1332(a)(2), 1350 and 1605.

2. The Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A ("FSIA"), provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and against any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, for wrongful death, personal injury, and related torts.

3. While acting within the scope of their employment, agents, employees, and officials of Iran violated the laws of nations, *jus cogens* norms, United States federal law and state law, directly, and in conspiracy with al Qaeda, and aided and abetted al Qaeda, and provided necessary training, knowledge and information to Qaeda with actual knowledge of Al Qaeda's intent to undertake terrorist attacks on the United States, including the 1998 bombing of the U.S. Embassy in Nairobi, Kenya ( the "Nairobi Embassy Bombing").

## VENUE

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

## PARTIES

5. Plaintiff Jane Kawira Naivasha is an adult citizen of Kenya.

6. Plaintiff Odillia Mutaka Mwani is an adult citizen of Kenya.

7. Plaintiff Noah Thuo Kimani is an adult citizen of Kenya.

8. Plaintiff Agnes Muthoni Kambo is an adult citizen of Kenya.

9. Plaintiff Alice N. Macharia is an adult citizen of Kenya.

10. Plaintiff Anne Faith Muthoni Ngeche is an adult citizen of Kenya.

11. Plaintiff Castro Otiende is an adult citizen of Kenya.

12. Plaintiff Charles Makori Mogi is an adult citizen of Kenya.

13. Plaintiff Cosmas Kangori Nkonge is an adult citizen of Kenya.

14. Plaintiff Dipak L. Shah is an adult citizen of Kenya.

15. Plaintiff Elijah Mutie is an adult citizen of Kenya.

16. Plaintiff Elizabeth Muthoni Wanyoike is an adult citizen of Kenya.

17. Plaintiff Emmanuel Kioko Muema is an adult citizen of Kenya.

18. Plaintiff Frida Namenge Odaya is an adult citizen of Kenya.

19. Plaintiff George N. S. Njoroge is an adult citizen of Kenya.

20. Plaintiff Jane Achieng Okwama is an adult citizen of Kenya.

21. Plaintiff Joyce Mumbi Muasya Kituku is an adult citizen of Kenya.

22. Plaintiff Judith Kyalo is an adult citizen of Kenya.

23. Plaintiff Julie Ogoye is an adult citizen of Kenya.

24. Plaintiff Julius Koom Marangu is an adult citizen of Kenya.

25. Plaintiff Justus Kimathi Mitili is an adult citizen of Kenya.

26. Plaintiff Patrick Wanjala Barasa is an adult citizen of Kenya.

27. Plaintiff Philip Kyalo Mauyu is an adult citizen of Kenya.

28. Plaintiff Philip Muriithi Mwai is an adult citizen of Kenya.

29. Plaintiff Phillip Kaniaru Gitahi is an adult citizen of Kenya.

30. Plaintiff Protus Buluma is an adult citizen of Kenya.

31. Plaintiff Richard Maina is an adult citizen of Kenya.

32. Plaintiff Rose Wanjiru Njoroge is an adult citizen of Kenya.

33. Plaintiff Susan Wairimu Kimemia is an adult citizen of Kenya.

34. Plaintiff Victoria Mutuku is an adult citizen of Kenya.

35. Plaintiff Wilfred Nderitu is an adult citizen of Kenya.

36. Plaintiff Margaret Musoke Wagabi is an adult citizen of Kenya.

37. Plaintiff Isaac Kabengi Ndambiri is an adult citizen of Kenya.

38. Plaintiff Nancy Amwoso Aswani is an adult citizen of Kenya.

39. Plaintiff John Chege is an adult citizen of Kenya.

40. Plaintiff Anne Gachara is an adult citizen of Kenya.

41. Plaintiff Stephen Kairu Maina is an adult citizen of Kenya.

42. Plaintiff Sheila Mwende Kalisa is an adult citizen of Kenya.

43. Defendant the Islamic Republic of Iran ("Iran") is a foreign state pursuant to 28 U.S.C. § 1391(f) and 1603(a). Iran has been designated a State Sponsor of Terrorism pursuant to the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and Section 6(j) of the Export Administration Act of 1979, 50 U.S.C. § 2405(j), continuously since January 19, 1984. Iran, through its officials, officers, agents, and employees, including the Islamic Revolutionary Guard Corps and the Iranian Ministry of Intelligence & Security (A/K/A Vexarat-e Ettela'at Va Amniat-e Keshvar A/K/A VEVAK A/K/A VAJA), provided material support and resources to Osama Bin Laden ("Bin Laden") and Al Qaeda, both directly and through its surrogate, Hesbollah. The support provided by Iran to Bin Laden and Al Qaeda assisted in or contributed to the preparation and execution of the plans that culminated in the Nairobi Embassy Bombing and the deaths and injuries caused by those bombings.

Iran conspired and agreed with all other Defendants and Al Qaeda to engage in the wrongful acts alleged in this Complaint, and in doing so participated in an unlawful act, or in a lawful act in an unlawful manner; and pursuant to and in furtherance of a common and extreme and outrageous plan to harm Plaintiffs.  Iran and each of its co-Defendants and Al Qaeda knowingly

and substantially aided and abetted other co-defendants in the wrongful acts alleged in this Complaint, with knowledge at the time of the overall tortious activity and with knowledge at the time that such aid and assistance would result in the extreme and outrageous tortious activity alleged in this Complaint.

44. Defendant the Islamic Revolutionary Guard Corps ("IRGC"), by and through its Quds Force ("IRGC-QF"), a political subdivision and/or agency of Iran responsible for providing military and intelligence services through which Iran trained, supported, and otherwise guided and directed the terrorist organizations responsible for causing Plaintiffs' injuries. On June 29, 2005, IRGC-QF was designed as a Specially Designated Global Terrorist pursuant to Executive Order 13382 and on April 15, 2019, the IRGC was designated a Foreign Terrorist Organization by the U.S. Department of State pursuant to Section 219 of the Immigration and Nationality Act, 8 U.S.C. § 1189.

45. Defendant the Iranian Ministry of Intelligence & Security (A/K/A Vexarat-e Ettela'at Va Amniat-e Keshvar A/K/A VEVAK A/K/A VAJA) ("MOIS") is a political subdivision and/or agency of Iran. MOIS provided support of terrorist activities directed against foreign targets by terrorist groups operating with the knowing support of Iran.

## FACTS COMMON TO ALL COUNTS

46. The following facts and averments are applicable to all Counts.

<u>From the Moment Defendants Seized Power in 1979 to the Present, Defendants Have Brutally and Barbarically Perpetrated Atrocities, Crimes Against Humanity and Violations of the Laws of Nations Against Innocent People, Including Plaintiffs and Americans, Around the War</u>

47. Since its inception in 1979 as a revolutionary theocracy, the Government of the Islamic Republic of Iran has declared its hostility to the United States and its allies and partners. NSPM-2, Feb.4, 2025. In 1979, fundamentalists led by Ayatollah Ruhollah Khomeini

overthrew the Iranian government led by the royal family of Mohammed Reza Shah Pahlavi. On November 4, 1979, as part of that revolution, a group of pro-Ayatollah students smashed the gates and scaled the walls of the American embassy in Tehran. Once inside, they seized 66 hostages, mostly diplomats and embassy employees. By midsummer 1980, 52 hostages remained in the embassy compound under the control of Iran, which did not release the hostages until January 1981.

48. By 1980, Iran, waged undeclared war by sponsoring and supporting terrorism and atrocities. The United States and other nations experienced the expansion of the threat from physical violence against diplomats to the beginnings of calculated terror campaigns, and psychological conflict waged by nation or sub-group against nation, with an ever-broadening range of targets, weapons, and tactics.

49. In 1980, in Bethesda, Maryland, an Iranian operative assassinated former Iranian diplomat-in-exile, Ali Akbar Tabatabai.

50. Hezbollah is a radical Shia group formed in 1982 in Lebanon and was and is often directed by Iran. Elements of the group were responsible for the kidnapping and detention of U.S. and other Western hostages in Lebanon. The group also attacked the Israeli Embassy in Argentina in 1992 and likely was the perpetrator of the 1994 bombing of the Israeli cultural center in Buenos Aires.

51. Iran provided material support for the October 23, 1983, suicide bombing attack that killed 241 U.S. service members in Beirut, Lebanon.

52. Iran provided material support for a series of damaging suicide vehicle bombings against United States installations in the Middle East, culminating with the second attack against the Embassy of Beirut, Lebanon on September 20, 1984.

53. In 1985, in Athens, Greece, Hizballah, with Iran's logistical support, hijacked TWA flight 847, killing a U.S. Navy diver.

54. From 1985-1986, in Paris, France, Hizballah bombed a number of soft targets, with logistical support from Iran, resulting in twelve deaths and over 200 injuries.

55. On July 13, 1989, in Vienna, Austria, Iranian operatives assassinated the head of an Iranian Kurdish dissident group and two others.

56. In 1991, in Suresnes, France, Iranian operatives assassinated former Iranian Prime Minister Shahpour Bakhtiar, who led an anti-Iranian regime movement.

57. On March 17, 1992, in Buenos Aires, Argentina, Hizballah detonated a vehicle-borne improvised explosive device (VBIED) outside the Israeli Embassy, killing 29 people and wounding 242, with logistical support from Iran.

58. On September 17, 1992, in Berlin, Germany, Hizballah, with Iran's logistical support, assassinated four Iranian Kurdish dissidents in a small-arms attack at a café.

59. On July 18, 1994, in Buenos Aires, Argentina, Hizballah detonated a VBIED outside the Argentine-Israeli Mutual Association, killing 85 people and wounding over 300, with Iran's logistical support.

60. The 1996 Khobar Towers bombing, killing 19 U.S. servicemen. The Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran. The Defendants' conduct in facilitating, financing, and providing material support to bring about this attack was intentional, extreme, and outrageous.

61. Iran provided material support for a 1997 triple suicide bombing on a crowded pedestrian mall in Jerusalem, which killed five bystanders and injured nearly 200 others. Among those wounded were eight U.S. citizens.

62. In 1997, in The Hague, Netherlands, four operatives were tried and convicted for the 1992 assassination of an Iranian dissident.

63. Beginning on September 28, 2000, a series of suicide bombings and rocket attacks by Iran-backed Hamas were horrific killing spree of over 1,000 Israelis and 64 foreigners.

64. On October 17, 2001, Rehavam Ze'evi, Israel's minister of tourism, was assassinated in the early morning hours at a hotel in Jerusalem by a member of the Popular Front for the Liberation of Palestine, an Iranian-funded Palestinian group.

65. On May 19, 2002, a Palestinian suicide bomber detonated the bomb at the front of the outdoor coastal market in Netanya, Israel. The attack, which killed three civilians and injured approximately 56 others, was claimed by Iran-backed Hamas.

66. On June 5, 2002, Palestinian Islamic Jihad funded by Iran initiated a suicide bombing attack at Meggido junction in northern Israel. As a result of the attack, 17 people were killed and an additional 50 were injured.

67. On October 4, 2003, Maxim, a beachfront restaurant in Haifa co-owned by Jews and Christian Arabs, was attacked by a suicide bomber tied to Palestinian Islamic Jihad, a terrorist organization primarily funded by Iran. The suicide bomber detonated her explosive belt in the middle of the restaurant which caused metal fragments to launch across the restaurant. The bombing resulted in 22 deaths with an additional 60 people wounded. Among those killed were four children with one of them only two months old.

68. Since the end of the 2006 Israeli-Hizballah conflict, Iran supplied Hizballah in Lebanon with thousands of rockets, missiles, and small arms in violation of UNSCR 1701. Iran has provided hundreds of millions of dollars in support of Hizballah and trained thousands of its fighters at camps in Iran. Hizballah fighters were used extensively in Syria to support the Assad regime.

69. In 2009, in Glendora, California, United States, an Iranian operative hired a hitman to assassinate a regime opponent.

70. On May 16, 2011, in Karachi, Pakistan, Iranian operatives assassinated Saudi diplomat Hassan al-Qahtani.

71. On September 29, 2011, in Washington, DC, United States, the IRGC-QF supported a plan to bomb a restaurant to assassinate the Saudi Ambassador to the United States.

72. On February 13, 2012, in New Delhi, India, the IRGC-QF directed a bomb attack targeting Israeli diplomats that injured one Israeli and three Indian citizens.

73. On February 14, 2012, in Bangkok, Thailand, three IRGC-QF operatives planned attacks against Israeli diplomats but were arrested after accidentally detonating explosives.

74. In 2012, in Nairobi, Kenya, two IRGC-QF operatives were arrested for planning bomb attacks against Western interests, and authorities discovered 33 pounds of explosives.

75. In 2012, in Manila, Philippines, authorities thwarted an Iranian plot to hijack a Saudi Arabian civilian aircraft.

76. In 2013, in Bosnia and Herzegovina, two Iranian diplomats were discovered to be Iranian intelligence officers and were expelled for espionage and terrorism connections.

77. On February 20, 2013, in Nigeria, three Iranian operatives were arrested for planning attacks against U.S. and Israeli tourist sites and organizations. A terrorist cell leader had received weapons training in Iran.

78. On February 20, 2016, in the United States, two Iranian operatives were charged for conducting covert surveillance of Israeli and Jewish facilities, and collecting identifying information about U.S. citizens and U.S. nationals who were members of an Iranian opposition group.

79. In 2016, in Kenya, two Iranian operatives and their Kenyan driver, employed by the Iranian embassy, were arrested for information collection related to a terrorist act after surveilling the Israeli embassy.

80. In 2017, in The Hague, Netherlands, an Iranian dissident was assassinated.

81. In March 2018, in Albania, Albanian authorities detained and deported two Iranian operatives for plotting terrorist activities against members of the Mujahedin e-Khalq.

82. In June 2018, in Belgium, France, and Germany, authorities arrested several Iranian operatives, including MOIS agents, involved in a plot to plant a bomb at a political rally in Paris, France.

83. On August 20, 2018, in the United States, two Iranian operatives were charged for conducting covert surveillance of Israeli and Jewish facilities in the United States and collecting information about U.S. citizens and U.S. nationals who were members of an Iranian opposition group.

84. In October 2018, in Denmark, authorities disrupted an Iranian plot to assassinate Iranian opposition figures.

85. In November 2019, in Turkey, Massoud Molavi, who ran an opposition social media site, was assassinated by Iranian operatives.

86. As of 2019, the Iranian regime and its proxies continued to plot and commit terrorist attacks on a global scale. Iran had spent as much as $700 million per year to support terrorist groups, including Hizballah and Hamas. Iran was directly involved in plotting terrorism through IRGC and the Ministry of Intelligence and Security, including plots in North and South America, Europe, the Middle East, Asia, and Africa. Iran continued to permit an Al Qaeda facilitation network to operate in Iran, sending money and fighters to conflict zones in Afghanistan and Syria, and Iran allowed Al Qaeda members to reside in the country. The Iranian regime

continued to foment violence, both directly and through proxies, in Bahrain, Iraq, Lebanon, Syria, and Yemen.

87. In January 2020, in Albania, Albania expelled two more Iranian diplomats for "activities incompatible with their diplomatic status."

88. In December 2020, in Albania, Albania expelled the Iranian ambassador and another diplomat for "damaging Albania's national security."

89. As of 2021, Iran continued its support for terrorist-related activity including support for Hizballah, Palestinian terrorist groups in Gaza, and various terrorist and militant groups in Iraq, Syria, Bahrain, and elsewhere throughout the Middle East. Iran used the IRGC-QF to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the region. The IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorist activity abroad. Iran also used regional militant and proxy groups to provide deniability, in an attempt to shield it from accountability for its destabilizing policies.

90. In 2021, In Iraq, Iran supported various Iran-aligned militia groups including the U.S.-designated terrorist groups Kata'ib Hizballah (KH), Harakat al-Nujaba, and Asa'ib Ahl al-Haq, with sophisticated weapons — including increasingly accurate and lethal unmanned aerial systems (UAS) — support, funding, and training. These groups conducted roughly two dozen rocket and UAS attacks on U.S. and coalition facilities across Iraq in 2021. These included rocket attacks on U.S. Embassy Baghdad on January 22 and July 8; explosive UAS attacks on U.S. facilities in Erbil on February 15, April 14, and July 6; and multiple attacks in June on U.S. and coalition forces at Ain Al-Assad Airbase. Additionally, Iran-aligned militia groups conducted an explosive UAS attack on Iraqi Prime Minister Kadhimi's residence on November 6.

91. Iran also bolstered terrorist groups operating in Syria, including Hizballah, which has provided significant support to the Assad regime.  Iran viewed the Assad regime in Syria as a crucial ally and Iraq and Syria as vital routes through which to supply weapons to Hizballah, Iran's terrorist proxy group.  Through financial or residency enticements, Iran has facilitated and coerced primarily Shia fighters from Afghanistan and Pakistan to participate in the Assad regime's brutal crackdown in Syria.  These Iran-aligned forces conducted an attack on U.S. forces at Al-Tanf, Syria, on October 20, 2021.

92. In 2021, Iran continued providing weapons systems and other support to Hamas and other U.S.-designated Palestinian terrorist groups, including Palestine Islamic Jihad and the Popular Front for the Liberation of Palestine-General Command.  These groups were behind numerous deadly attacks originating in Gaza and the West Bank.

93. In Bahrain, Iran continued to provide weapons, support, and training to local Shia militant groups, including the al-Ashtar Brigades and Saraya al-Mukhtar, both U.S.-designated terrorist groups.

94. In 2021, Iranian forces attacked several commercial ships in the Gulf of Oman, including an April 13 attack on the *Hyperion Ray* and a July 29 UAS attack on the *Mercer Street* vessel.

95. Iran pursued or supported terrorist attacks against Israeli targets in 2021, including a thwarted January plot to attack an Israeli embassy in East Africa, and a January bomb attack outside the Israeli embassy in New Delhi for which the Indian government said the IRGC-QF was responsible.

96. Senior Al Qaeda ("AQ") members continued to reside in Iran.  Iran allowed AQ facilitators to operate a core facilitation pipeline through Iran since at least 2009, enabling AQ to move funds and fighters to South Asia and Syria, among other locales.

97. As in past years, the Iranian government continued supporting terrorist plots or associated activities targeting Iranian dissidents.  In recent years, Albania, Belgium, and the Netherlands have all either

arrested or expelled Iranian government officials implicated in various terrorist plots in their respective territories. Denmark similarly recalled its ambassador from Tehran after learning of an Iran-backed plot to kill an Iranian dissident in Denmark.

98. In 2021, the United States disrupted an Iranian intelligence network plot to kidnap Masih Alinejad, an Iranian American journalist and human rights advocate living in Brooklyn, New York, from within the United States. The plot entailed luring Alinejad to a third country to capture her and forcibly render her to Iran. An Iranian plot to kidnap an Iranian helicopter pilot from Türkiye was also reportedly foiled by Turkish authorities.

99. On October 7, 2023, the largest organized mass killing by an Islamist terror group against a democracy in modern history was conducted by thousands of Iranian proxies from Hamas. 1200 people were murdered and around 240 others taken hostage, including Americans. The Iranian proxies deliberately and systematically utilized terror, torture and rape, and have viciously abused and killed civilians including children and the elderly. Many hostages remain in captivity.

100. Five hundred (500) operatives from Hamas and Palestinian Islamic Jihad received specialized combat training in Iran in the weeks leading up to the October atrocities. IRGC-QF conducted the training with top Iranian and Palestinian leaders in attendance.

101. On November 1, 2024, Iran announced that it had the capacity to produce nuclear weapons, and on November 2, 2024, IRGC Guard threatened Israel and the United States with an attack "… beyond the enemy's comprehension, strategic, and powerful."

102. In or around February 2025, the IRGC announced that "Operation True Promise 3 will be carried out at the right time, with precision, and on a scale sufficient to destroy Israel and raze Tel Aviv and Haifa to the ground." The population of Tel Aviv and its surroundings is 4.5

million. The population of Haifa is 1.2 million. 500,000 Americans live in Israel. 100,000 Americans live in Tel Aviv.

103.    Iran remains the world's leading state sponsor of terror and has aided Hezbollah, Hamas, the Houthis, the Taliban, al-Qa'ida, and other terrorist networks…The Iranian Government, including the IRGC, is using agents and cyber-enabled means to target United States nationals living in the United States and other countries around the world for attacks, including assault, kidnapping, and murder. Iran has also directed its proxy groups, including Hezbollah's Islamic Jihad Organization, to embed sleeper cells in the Homeland to be activated in support of this terrorist activity. Iran bears responsibility for the horrific Hamas massacres committed on October 7, 2023, and bears responsibility for continued Houthi attacks against the United States Navy, allied navies, and international commercial shipping in the Red Sea. Since April 2024, the regime has twice demonstrated its willingness to launch ballistic and cruise missile attacks against the State of Israel. Iran commits grievous human rights abuses and arbitrarily detains foreigners, including United States citizens, on spurious charges without due process of law, subjecting them to abuse. The United States stands with the women of Iran who face daily abuse by the regime. Iran's nuclear program, including its enrichment – and reprocessing-related capabilities and nuclear-capable missiles, poses an existential danger to the United States and the entire civilized world…. Iran today stands in breach of its Nuclear Non-Proliferation Treaty obligations by concealing undeclared nuclear sites and material as required by its Comprehensive Safeguards Agreement with the International Atomic Energy Agency (IAEA). Iran has obstructed IAEA access to its military sites or sites tied to the Organization of Defensive Innovation and Research, also known as SPND, and to interview nuclear weapons scientists

still employed by SPND. Public reports indicating that Iran may now be engaged in computer modeling related to nuclear weapons development raise immediate alarm. NSPM-2, Feb.4, 2025. The 2025 Annual Threat Assessment of the U.S. Intelligence Community ("ATA") reported that Iran has a robust missile capability and an expanded nuclear program, and that Al Qaeda leaders remain in Iran. ATA March 25, 2025. Iran announced as its policy, and not as a mere slogan, "Death to America." Defendants, and each of them, have been continuously engaged since 1979 in a uniquely-atrocious national policy of terror and destruction directed at the United States, and its allies, and unparalleled violation of all jus cogens norms, and of the laws of nations, and of the bedrock principles of civilization.

<u>Defendants Knew Of The Threat Posed By Bin Laden And Al Qaeda<br>To United States Facilities Abroad</u>

104.    Osama Bin Laden ("Bin Laden") is and has been known by the United States and to Defendants to be one of the most significant sponsors of terrorist groups. Bin Laden financed, recruited, transported, and trained Arab nationals who volunteered to fight in Afghanistan. During the war in Afghanistan, Bin Laden founded Al Qaeda to serve as an operational hub for like-minded extremists.

105.    In August 1996, Bin Laden and Al Qaeda issued a public statement outlining his organization's goals: drive U.S. forces from the Arabian Peninsula, overthrow the Government of Saudi Arabia, "liberate" Muslim holy sites in "Palestine," and support Islamic revolutionary groups around the world.

106.    Since August 1996, Bin Laden had been increasingly vocal in expressing his approval of and intent to use terrorism. He claimed responsibility for attempting to bomb U.S. soldiers in Yemen in late 1992 and for attacks on them in Somalia in 1993, and his organization aided the Egyptian al-Gama'at al-Islamiyya in its assassination attempt on Egyptian President Mubarak

in Ethiopia in 1995. In November 1996, he publicly called the 1995 and 1996 bombings against U.S. military personnel in Saudi Arabia "praiseworthy acts of terrorism." At the same time, he publicly called for further attacks against U.S. military personnel, saying: "[i]f someone can kill an American soldier, it is better than wasting time on other matters."

107.   On August 23, 1996, Bin Laden and Al Qaeda publicly issued a pronouncement or "fatwah" that efforts should be pooled worldwide to kill Americans. Specifically, Bin Laden and Al Qaeda issued a Declaration of Jihad entitled "Message from Usamah Bin – Mohammad Bin – Ladin to his Muslim Brothers in the Arabian Peninsula: Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula."

108.   On February 23, 1998, Al Qaeda published in the Al-Quds Al-Arabi newspaper in London the following statement: "[t]o kill Americans and their allies – military and civilian – is an individual duty of every Muslim who can do it in any country in which it is possible to do it."

109.   The statements set forth in paragraphs 102-104 of the Complaint were published and communicated publicly and were available to all Defendants.

<u>Defendants Provided Critical Support
For The Vehicle Bomb Attack On The Nairobi Embassy</u>

110.   Prior to 1998, Iran entered into a civil and criminal conspiracy with Bin Laden and Al Qaeda, and knowingly and substantially aided and abetted Al Qaeda for the purpose of committing terrorist acts against the United States and its allies, and for the purpose of killing and terrorizing Americans and their allies, and participated in unlawful acts, and in lawful acts in an unlawful manner, and pursuant to and in furtherance of a common scheme, known to Iran at the time, to harm, terrorize and kill Americans and their allies.

111.    Bin Laden's operatives approached Iranian Ministry of Intelligence and Security agents in 1995 and again in 1996 offering to join forces against the United States.

112.    Al Qaeda operatives were allowed to travel through Iran with great ease.

113.    Persistent contacts between Iranian security officials and senior Al Qaeda figures took place.

114.    Iran entered into an informal agreement by which Iran would support Al Qaeda training with the understanding that such training would be used for actions carried out primarily against the United States and its allies.

115.    Phone records obtained by U.S. officials investigating the 1998 Embassy bombings in Kenya and Tanzania (the "1998 East African Embassy Attacks") revealed that 10 percent of the calls from the compact and satellite phones used by Bin Laden and his key lieutenants were to Iran.

116.    Iran, with actual knowledge of the terrorist plans of Al Qaeda against the United States, provided to Al Qaeda prior to the Nairobi Embassy Bombing material and critical aid, support and training for terrorist bombings, including vehicle bombings.

117.    Prior to 1998, Iran developed, trained and espoused the use of mass casualty terrorist ("MCT") bombings. MCT bombings are violations of international law, and *jus cogens norms*, and are crimes against humanity and against the laws of nations.

118.    From 1969 to 1983, 200 terrorist bombings occurred worldwide. From 1984 to 2003, 3163 terrorist bombings occurred. From 1991 to 2000, 88% of terrorist attacks resulting in casualties of 30 or more involved explosions.

119.    Bombings result in a specific, predictable and known spectrum of injuries. The injuries of those close to the bombing are predictable, complex, multiple and severe. The injuries and loss

suffered by the families of the victims are psychologically, emotionally, financially devastating, and permanent. The injuries – including continuous fear and terror – sustained by those made aware of the terrorist attack are widespread. The injuries are not only foreseeable; they are the intended result of an MCT bombing, and they were the intended result of the Nairobi Embassy Bombing, and they were the result of the Nairobi Embassy Bombing.

120.    Defendants knew and understood at all times pertinent to this Complaint that:

   (a) An explosion occurs when a substance reacts rapidly with oxygen to release energy and produce a large volume of gaseous products.

   (b) Although some energy is in the form of heat and sound, most exists as either a blast wave that moves outward from the epicenter of the blast at speeds greater than the speed of sound or as kinetic energy possessed by the gaseous products, debris and shrapnel, resulting in shrapnel injury and impalements.

   (c) Primary injuries occur as energy is transmitted through the body along visceral structures. Shearing occurs at interfaces of tissues of differing densities. Within limbs partial amputation occurs as energy is transmitted along long bones, with forces occurring coaxially to the bone causing comminution, and shearing at bone/soft tissue interfaces. Air containing organs such as lungs, middle ear and the gastrointestinal tract are particularly vulnerable to the blast wave. Eardrums may rupture. The thoracic cavity is subject to a series of injuries. Pulmonary damage, alveoli tears, airway ruptures, Adult Respiratory Distress Syndrome, lung collapse, displacement, and shearing of the abdominal cavity and perforation of the intestines are all injuries which result from the increase in atmospheric pressure

   (d) Secondary blast injuries occur when the intense release of energy causes an advancing cloud of gaseous products carrying debris and fragments of mobilized objects. The effect completes limb amputation, causes abdominal wall tears, evisceration, and a wide spectrum of blunt and penetrating injury of soft tissue.

   (e) The blast generates tremendous heat, which in turn causes flash burns on exposed parts of the body, such as the face, neck and hands, and the ignition of hair and clothing.

   (f) The blast generates injuries from the inhalation of noxious gases, building collapse, the electrocution from fallen cables and secondary explosions. As to subsections (a) – (f), see Morepy, b., Leslie, GD, Terrorist Bombings, Motives, methods and Patterns of Injury. AENJournal, 10:1 (March 2007).

(g) MCTs in the area of the U.S. Embassy in Nairobi would be likely to, and did, cause high-velocity projection of glass shards, which penetrating bodies, including eyes, resulting in permanent blindness.

(h) MCT's in the area of the U.S. Embassy in Nairobi would be likely to, and did, cause victims to be buried alive.

121.    Defendants knew and understood, and in fact intended, that death and the physical injuries described in the preceding paragraph, and permanent and horrible pain, disfigurement and disability were likely to be and would be sustained by innocent civilians, including women and children, as a consequence of the detonation of an MCT bomb at the U.S. Embassy in Nairobi.

122.    Defendants knew and understood, and in fact intended, that innocent civilians, including women and children, would sustain severe and permanent emotional distress, severe and permanent fear and terror, post-traumatic stress disorder ("PTSD"), and severe and permanent psychological and emotional injuries arising out of interference with familial obligations, including shame and guilt, as a consequence of the detonation of an MCT bomb at the U.S. Embassy in Nairobi.

123.    Defendants knew and understood, and in fact intended, that the families of the victims would sustain devastating personal and financial loss, humiliation and embarrassment, sustain severe and permanent emotional distress, and severe and permanent fear and terror, as a consequence of the detonation of an MCT bomb at the U.S. Embassy in Nairobi.

124.    Defendants knew and understood, and in fact intended, that innocent civilians, including women and children, upon learning of the MCT bombing, would sustain severe and permanent emotional distress, and severe and permanent fear and terror, as a consequence of the detonation of an MCT bomb at the U.S. Embassy in Nairobi.

125.    Defendants knew and understood, and in fact intended, that the events and injuries set out by Plaintiffs herein would result from the detonation of an MCT bomb at the U.S. Embassy in Nairobi.

126.    Defendants' MCT Nairobi Embassy bombing was a part of defendants' continuing plan and policy from 1979 to the present to perpetrate acts of terror against the United States and its allies, including Kenya, in violation of the laws of nations, and jus cogens norms, and constitute a continuous and ongoing crime against humanity.

127.    Defendants concealed their participation, including in particular their direct participation, in the Nairobi Embassy Bombing.

128.    Iran provided material support to Al Qaeda which directly resulted in the 1998 East African Embassy Attacks.

129.    Iran aided and abetted Hezbollah, Bin Laden, and Al Qaeda to launch large-scale bombing attacks against the United States via powerful suicide truck bombs. During the relevant time period, the Iranians, through Hezbollah, provided explosives training to Bin Laden and Al Qaeda and rendered direct assistance to Al Qaeda operatives.

130.    Support from Iran and Hezbollah was critical to Al Qaeda's execution of the 1998 East African Embassy Attacks. Before its meetings with Iranian officials and agents, Al Qaeda did not possess the technical expertise required to carry out the embassy bombings. In the 1990s, Al Qaeda received training in Iran on how to destroy large buildings with sophisticated and powerful explosives. The government of Iran was aware of and authorized this training and assistance.

131.    Iran directly participated with al Qaeda in the Nairobi Embassy Bombing. Evidence of Iran's direct participation in the 1998 Embassy bombing has recently been discovered.

132.    On July 25, 2024, in a speech before a Joint Meeting of the United States Congress, the

Prime Minister of Israel stated as follows:

> "Iran's regime has been fighting America from the moment it came to power. In 1979, it stormed the American embassy, it held scores of Americans hostage for 444 days. Since then, Iran's terrorist proxies have targeted America in the Middle East and beyond. In Beirut, they killed 241 U.S. servicemen. In Africa, they bombed American embassies. In Iraq, they supplied explosives to maim and kill thousands of American soldiers. In America, they actually sent death squads. They sent death squads here to murder a former secretary of state and a former national security adviser. And as we recently learned, they even brazenly threatened to assassinate President Trump."

133.    The Prime Minister of Israel was also the Prime Minister of Israel in 1998.

134.    From 1975 to 2019, only 78 foreign leaders, including Pope Francis, and the heads of state

of Afghanistan, Australia, France, Germany, Great Britain, India, Ireland, Israel, Japan, Jordan,

Korea, Mexico and Ukraine, have addressed by invitation a Joint Meeting of Congress.

135.    The Institute for Intelligence and Special Operations, popularly known as Mossad, is the

national intelligence agency of the State of Israel. The Mossad is concerned with foreign

intelligence gathering, intelligence analysis, and covert operations.

136.    Mossad reports directly to the Prime Minister of Israel.

137.    Mossad, and thus the Prime Minister of Israel, is uniquely capable of discovering Iranian

secret information, including information on Iran's support for militias and other terrorist

groups around the region.

138.    In 2017, Mossad agents covertly recovered from Iran half a ton of secret material consisting

of 55,000 pages and another 55,000 files on 183 CDs.

139.    Ali Yunesi, a former Iranian intelligence minister and top adviser to President Rouhani, issued

this warning in an interview: "[t]he Mossad's influence in many parts of the country is so vast that

every member of the Iranian leadership should be worried for their lives, for their safety." BBC

News, Feb.5, 2022, https://www.bbc.com/news/world-middle-east-60250816. America's network

of informers had largely been lost to Tehran's brutally efficient counterintelligence operations, which has stymied efforts to rebuild it. Israel has helped fill the breach, officials say, its robust operations in Iran providing the United States with streams of reliable intelligence on Iran's nuclear activities, missile programs and on its support for militias around the region. https://www.nytimes.com/2021/08/26/world/middleeast/us-israel-bennett-cia-mossad.html

140.    Abdullah Ahmed Abdullah, who went by the nom de guerre Abu Muhammad al-Masri, Al Qaeda's second-highest leader, was one of the masterminds of the deadly 1998 attacks on American embassies in Africa.

141.    In Iran, al-Masri mentored Hamza Bin Laden, Bin Laden' son. Hamza Bin Laden later married al-Masri's daughter.

142.    Al-Masri  was killed in Tehran on August 7, 2020, the anniversary of the 1998 East African Embassy Attacks.  At the time of al-Masri's death, U.S. intelligence officials disclosed that al-Masri had been in Iran's "custody" since 2003 and had been living freely in the Pasdaran district    of    Tehran,    an    upscale    suburb,    since    at    least    2015. ttps://www.nytimes.com/2020/11/13/world/middleeast/al-masri-abdullah-qaeda-dead.html.

143.    On November 1, 2023, Iranian Supreme Leader Ayatollah Ali Khamenei that "death to America" is not just a slogan, it's a policy. https://www.memri.org/tv/iran-supreme-leader-ayatollah-ali-khamenei-death-america-not-slogan-policy-west-protests.    He    further    stated: "[i]f it were not for America's support, if it were not for the support of U.S. weapons, the corrupt and artificial Zionist regime would have been destroyed in the first week. It would have collapsed. The Americans are behind this."

144.    Commencing no later than December 2023, and continuing through at least through November 2024, Defendants planned and ordered the assassination of Donald J. Trump. 24 MAG 3904 (SDNY 2024).

145.    On September 27, 2024, Brigadier General Abbas Nilforooshan, deputy chief of operations for Iran's IRGC, was killed in the same attack that killed Hassan Nasrallah in Lebanon.

146.    On August 7, 1998, by and through their agents and co-conspirators, Bin Laden and Al Qaeda carried out their planned vehicular bomb attack. Mohammad Sadeek Odeh ("Odeh") was an agent and operative for Bin Laden and Al Qaeda in all matters related to the Nairobi Embassy Bombing.  As a result, over 200 Kenyans were killed and over 4000 Kenyans were injured.  Plaintiffs sustained injury and damage as a result of that attack.

147.    On August 7, 1998, at approximately 10:30 a.m. local time, agents for Bin Laden and Al Qaeda driving in a truck detonated a large bomb in the rear parking area, near the ramp to the basement garage, of the American Embassy in Nairobi. A total of 213 people were killed, of whom 44 were American Embassy employees (12 Americans and 32 Foreign Service National ("FSN") employees). Ten Americans and eleven FSNs were seriously injured.  Over 200 Kenyan civilians were killed and over 4000 were injured by the blast in the vicinity of the embassy.

148.    Damage to the embassy was massive. the explosion reduced much of the interior to rubble – destroying windows, window frames, internal office partitions and other fixtures on the rear side of the building.  The secondary fragmentation from flying glass, internal concrete block walls, furniture, and fixtures caused most of the embassy casualties.

149.   The majority of the Kenyan casualties resulted from the collapse of the adjacent Ufundi Building, flying glass from the nearby Co-op Bank Building and other buildings located within a two to three block radius.

150.   Other casualties were pedestrians, riders or motorists in the crowded streets next to the embassy.

   The Infliction Of Terror, Death, Loss And Injury By Defendants And Their Co-Conspirators

151.   Plaintiff Jane Kawira Naivasha's husband Abel Mutegi Njiru was killed in the Embassy bombing.  They had been married for three and a half years.

152.   Ms. Naivasha has six brothers and two sisters and was raised in a Kenyan town about 250 kilometers outside of the capital city of Nairobi. She received her "A" level, or high school level education there, and attended Griffins Secretarial College in Nairobi for two and a half years. She did not complete her college courses initially because of financial constraints and, later, because of the death of her husband.

153.   In 1983 Ms. Naivasha began a temporary job as a receptionist in Nairobi with an insurance company then called Minet ICDC and now called AON Kenya.  Ms. Naivasha later became a permanent employee with that company, where she is employed today.

154.   Ms. Naivasha met her husband at work.  He was a client of the firm, and they began dating. Their son was born in 1994. They were married on March 2, 1996, and began to live together after their marriage.  They rented a home in a home in a good neighborhood with good schools. The family stayed in that home until Mr. Njiru's death.

155.   Her husband was a high school teacher and a writer, and brought in most of the family income.

156.    They lived a happy married and family life.  Ms. Naivasha testified that "I received the best love that I could get from a husband…. [H]e would always be out looking for me and if I'm well…. I kept saying I had the best marriage ever." Transcript I, at 18.  They traveled together, and shared hobbies.  Ms. Naivasha reviewed her husband's writing and attended the theatre with him on weekends. They were only apart for one week during their marriage, and that separation was "hard." Transcript I, at 21.  They had planned on having three children. Ms. Naivasha was pregnant with their second child on the day her husband died.

157.    Their son, who was three years and 11 months old on the day of the Embassy bombing, was doing well in school. Mr. Njiru was a good father and "friend" of his son, who was attending the school in which Mr. Njiru taught.

158.    In the morning of the Embassy bombing, their lives were "very happy. Nothing seemed like would go wrong…." Transcript I, at 23.  That day was a school holiday, so Mr. Njiru was at the Ufundi Cooperative House near the American Embassy. He told Ms. Naivasha that he was going to see a doctor that morning because he had the flu. Ms. Naivasha was at work a couple of kilometers from the American Embassy.

159.    She and others at her office heard a loud bang but attributed it to a strike that was taking place. But by 3:00 PM Ms. Naivasha began to worry because her husband had not contacted her, even though he always called her during the day to talk about events taking place.  She tried to go to the area of the American Embassy because she and her colleagues had heard that the Embassy had been attacked, but she could not get close to the scene.  There were people "everywhere," *id*, at 26, and vehicles leaving the scene, and dust.  She returned to her office, "collected herself," *id*., at 27, and called the doctor, but was told that her husband had left to go to his office around 10:00 AM.

160.    She left work early and went home. She called her family, who came over to her house. She testified that: "[w]e watched as we waited for him to, hopefully, come home. But we continued watching. We continued watching. And 8:00, 9:00, 10:00 he hadn't called, he hadn't come. 11:00, midnight he hadn't come…. I was hoping he was somewhere helping out with the victims" *Id*., at 27.

161.    The family then decided to start searching the hospitals. They divided into teams of three. Ms. Naivasha searched hospitals for three days. The scenes at the hospitals were "traumatic," with "blood everywhere," and with the constant sound of ambulances and with people crying. *Id*., at 28.  At the end of each day, Ms. Naivasha would return home. Her son asked: "Where's daddy? Did you come home with daddy?" *Id*., at 28. The day after the embassy bombing, Ms. Naivasha had a miscarriage.

162.    By Sunday, two days after the bombing, the rescue operation was continuing.  Ms. Naivasha could not continue searching hospitals. She was "traumatized," she could not sleep. Id., at 34. On Monday, she stayed in her house while her relatives continued the search.  That day, her brother-in-law said that they should start checking the mortuaries.  On Tuesday, Ms. Naivasha heard an announcement that the rescue operation had ended.

163.    On Wednesday, her sister and brother-in-law approached the house, and Ms. Naivasha could tell from their expressions that her husband's body had been found. They explained that the body had been found "in the rubble," and that a leg and an arm had been severed, and that his head was "completely smashed up." *Id*., at 42.  Ms. Naivasha was "completely blind" by the news, and went to her bedroom to cry. *Id*., at 42. She testified that she wasn't in her "right mind," *id*., at 43, and she did not view the body because she wanted to remember her husband as he was when he was alive.

164.    Financially, the loss of her husband compelled Ms. Naivasha to cancel the exam she had
scheduled for September to advance her schooling.  In four months, she was forced to leave
her home, and relocate to a one bedroom "slum" with an outside latrine.  *Id.*, at 47.  She placed
her son in a less expensive school.  She continues to struggle financially without her husband.
Her happy life changed completely as a result of her husband's death.

165.    Emotionally, she suffered from headaches, sleeplessness and depression.  She was
"stigmatized" by friends, who, consistent with certain elements of African culture, wondered
what she had done to bring tragedy upon herself and her husband.  *Id.*, at 48.  Her son has
suffered from the loss of his father, and is taunted at school because he doesn't have a father.
Ms. Naivasha has assumed the role of both mother and father to her son.

166.    Ms. Naivasha still remembers the tragic events surrounding her husband's death.  She still
cries a great deal at the painful memories.  She testified: "I'm wondering why did it happen.
We would be together now.  We'd have another two children…. It's just that emptiness that I
cannot explain."

167.    Mr. Noah Thuo Kimani's wife of eight years Felistas Njeri Thuo was killed in the Embassy
attack.

168.    Mr. Kimani had six brothers and sisters, though three have died.  He was raised in a small
village in central Kenya.  He moved to Nairobi in 1985, at age eighteen.  He got a degree in
welding and pipe fitting in Nairobi at that time.

169.    He met his future wife while they were both looking for jobs in Nairobi in 1989.  It was,
he testified, "love at first sight." Transcript II, at 52.  Felistas was pretty, sweet, humble and
loving.  She loved Mr. Kimani, he testified, even though he was a very poor man at the time.

170.    Felistas gave birth to their daughter Sheila in 1989, and they were married in a rural ceremony in 2000. They moved into an apartment in a "[n]ot very good section of Nairobi." *Id.*, at 54. Because Felistas got a job before he did, Mr. Kimani stayed home with his daughter and continued to look for work.

171.    Felistas was hired as a secretary by Consolidated Insurance Brokers in Nairobi. Her goal was to obtain promotions, and eventually, go back to school. Their office was near the American Embassy.

172.    Mr. Kimani got a job in 1991. A year later, he opened his own printing and stationery business. When he started, he was serving as a broker, because he had no equipment of his own. His business became very successful. He was netting about 200,000 KSH per month. His office was near the American Embassy.

173.    They moved into a much larger home in a far better neighborhood. In 1994, they had their second daughter. He spent all of his available time with his family. He and his wife went to work together, and returned together. They went to church together, and chatted together in the mornings and evenings. They spoke many times over the phone during the day. On Sundays, the family took short trips and outings. They dreamed of buying their own building together. Mr. Kimani's life was, as he testified, "a bed of roses."

174.    On the morning of August 7, 1998, Felistas dressed first, and asked Mr. Kimani how she looked. He remembers telling her "you look marvelous." *Id.*, at 69. That morning, she left for her office without him, telling him to find her later in the city.

175.    He arrived in his office later. Felistas called him that morning, at the office, and asked him to come by her office because a vendor had "some beautiful ties" to sell. *Id.*, at 69. While he

reached in his drawer for money to bring to his wife's office, he heard a loud gust of wind, and everything in his office collapsed.  The phone line went dead.

176.    He decided to walk to her office to tell her what happened in his office, because he was still under the impression that the impact was restricted to events in his office building.

177.    As he headed toward the American Embassy, he saw many people running in the opposite direction.  They were covered with blood. He saw one body burned beyond recognition. He saw one body pierced by a piece of wood. He "pushed on."  He now knew he had to find his wife.

178.    He went to the pile of rubble, and he heard people crying inside.  He tried to remove pieces of concrete with his hands, but could not move the heavy pieces.  There was chaos everywhere, he testified.

179.    Mr. Kimani testified that he wanted to believe that his wife was only hurt, and that she was still alive.  So, he decided that he would search the hospitals.  Because there were no available vehicles, he walked 10 kilometers to Kenyatta National Hospital.  He testified that the hospital was in disarray.  He went from bed to bed in the nine-floor hospital, lifting sheets in his search for his wife. He went to three other hospitals, following the same procedure, and was unsuccessful.  He returned to each of the first two hospitals, again with no success.

180.    He returned home, and, when he saw his daughter in the morning, she asked him, "where is mommy?" he told his daughter: "[s]he will come home. But it never happened."

181.    He went to Nairobi Hospital, where one of her colleagues told him that he had heard Felistas cry out for help.  Mr. Kimani waited and prayed.

182.    On Sunday, a colleague approached with a piece of cloth, and asked Mr. Kimani if he recognized it.  Mr. Kimani said that it was the fabric Felistats was wearing the morning she

last left for work.  The colleague began to depart without saying another word, but his companion asked where he had gotten the fabric, and the colleague whispered to the companion.  That is when Mr. Kimani was told that his wife's body was at the mortuary.  Mr. Kimani then went to the mortuary with members of his family.

183.    They arrived there and entered the cold rooms where the bodies are kept. And it was a scene you would not want to ever see again. It was a scene, it's something that even today makes one shiver with fear. Those bodies were aligned in rows. Others were heaped. And even in [em]bracing with your next of kin, it was (a) very, very, very hard task.

184.    So Mr. Kimani went from one side to the other looking for her. And on the way, there were hundreds and hundreds of bodies badly mutilated. Badly, badly, badly mutilated. Some had no limbs, some had no heads, some had their stomachs opened. Some had, some were crushed to something very tiny…. And at the end, he saw where she was….

185.    Mr. Kimani found her by the piece of fabric, and that his wife was unrecognizable except for her feet.  Her head was crushed.

186.    Mr. Kimani returned home to tell his daughters that their mother had gone to be with God. But his daughter asked: "why didn't you come back with her?".  He told her he tried.  He asked her to be strong and not to cry.  During the burial, his daughter asked him for his permission to cry for her mother, so Mr. Kimani and his two daughters went to a small room and cried for Felistas.

187.    Mr. Kimani endured emotional injury, and lost interest in living.  He stopped working, and exhausted the family savings.  He did not want to be in the family home. His daughter asked him why he let their mother die.

188.    After a year, he stopped drinking, but his family continued to struggle.  His older daughter has behavioral problems at home and at school.

189.    Mr. Kimani cannot forget the images from the mortuary. He has remarried, but he has not overcome the loss of his wife, Felistas.

190.    Mrs. Odillia Mutaka Mwani's husband, Moses Ashton Mwani, was killed in the Embassy bombing. They had been married for twenty-seven years and had four children.

191.    Mrs. Mwani's husband worked at the Teachers Service Commission building next to the Embassy. On the day of the attack, she heard a loud noise and rumors immediately began circulating of a bombing. Later in the day, she saw news reports which confirmed the bombing of the Embassy. She began to panic. She could not reach my husband and set out to search for him with her family. They began searching at various hospitals in Nairobi. Hospitals were filled with the dead and the dying from the Embassy bombing. Many families, like her own, were searching for their loved ones. After two days of searching, they found her husband. His body lay on a stretcher. His head was nearly severed with fragments of glass penetrating his body.

192.    Mrs. Mwani endured extreme emotional suffering commencing with the moment that she became aware of the bombing and its proximity to her husband, and continuing through the horrible search for him, the discovery of his body, and the years since August 7, 1998. Mrs. Mwani has not remarried and misses her late husband every day.  Mrs. Mwani has suffered through the loss of companionship and the loss of her late husband's income.

193.    The suffering endured by Plaintiffs Navaisha, Kimani and Mwani as a result of the Nairobi Embassy Bombing is typical of the suffering endured by all Plaintiffs, and was foreseeable and in fact intended by Defendants.

194.    Plaintiff Agnes Muthoni Kambo is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

195.    Plaintiff Alice N. Macharia is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

196.    Plaintiff Anne Faith Muthoni Ngeche is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

197.    Plaintiff Castro Otiende is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-three million five hundred seventy-one thousand four hundred ($163,571,400.00) dollars against Al Qaeda.

198.    Plaintiff Charles Makori Mogi is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-three million five hundred seventy-one thousand four hundred ($163,571,400.00) dollars against Al Qaeda.

199.    Plaintiff Cosmas Kangori Nkonge is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

200.    Plaintiff Dipak L. Shah is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

201.    Plaintiff Elijah Mutie is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

202.    Plaintiff Elizabeth Muthoni Wanyoike is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

203.    Plaintiff Emmanuel Kioko Muema is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-six million nine hundred sixty-four thousand two hundred fifty ($166,964,250.00) dollars against Al Qaeda.

204.    Plaintiff Frida Namenge Odaya is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

205.    Plaintiff George N. S. Njoroge is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

206.    Plaintiff Jane Achieng Okwama is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

207.    Plaintiff Joyce Mumbi Muasya Kituku is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

208.    Plaintiff Judith Kyalo is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

209.    Plaintiff Julie Ogoye is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

210.    Plaintiff Julius Koom Marangu is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

211.    Plaintiff Justus Kimathi Mitili is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

212.    Plaintiff Patrick Wanjala Barasa is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

213.    Plaintiff Philip Kyalo Mauyu is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

214.    Plaintiff Philip Muriithi Mwai is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

215.    Plaintiff Phillip Kaniaru Gitahi is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

216.    Plaintiff Protus Buluma is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-six million nine hundred sixty-four thousand two hundred fifty ($166,964,250.00) dollars against Al Qaeda.

217.    Plaintiff Richard Maina is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

218.    Plaintiff Rose Wanjiru Njoroge is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

219.    Plaintiff Susan Wairimu Kimemia is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

220.    Plaintiff Victoria Mutuku is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

221.    Plaintiff Wilfred Nderitu is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-three million five hundred seventy-one thousand four hundred ($163,571,400.00) dollars against Al Qaeda.

222.    Plaintiff Margaret Musoke Wagabi is an adult citizen of Kenya. On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

223.    Plaintiff Isaac Kabengi Ndambiri is an adult citizen of Kenya On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

224.    Plaintiff Nancy Amwoso Aswani is an adult citizen of Kenya On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

225.    Plaintiff John Chege is an adult citizen of Kenya On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

226.    Anne Gachara is an adult citizen of Kenya On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

227.    Stephen Kairu Maine is an adult citizen of Kenya On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

228.    Sheila Mwende Kalisa is an adult citizen of Kenya On May 20, 2022, judgment was entered in the amount of one hundred sixty-one million three hundred nine thousand five hundred ($161,309,500.00) dollars against Al Qaeda.

229.    Each of the judgments noted above was the result of the Nairobi Embassy Bombing and included one hundred fifty million ($150,000,000.00) dollars in punitive damages.

**COUNT I**
**OFFENSIVE COLLATERAL ESTOPPEL**

230.    Plaintiffs adopt, as if specifically set forth herein, the averments of paragraphs 2, 3, and 45-229.

231.    In August 2008, certain victims of the 1998 East African Embassy Attacks and their immediate family members filed lawsuits against Iran, IRGC, and MOIS and the Republic of Sudan under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, seeking damages as a result of Iran and Sudan's material support of Al Qaeda which directly resulted in the 1998 East African Embassy Attacks. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011) (the "Owens Action.")

232.    On November 28, 2011, following a three-day bench trial this Court entered a "judgment on liability" in favor of plaintiffs against the Republic of Sudan, the Ministry of the Interior of the Republic of Sudan, the Islamic Republic of Iran, the Iranian Revolutionary Guards Corps, and the Iranian Ministry of Information and Security in the Owens Action.

233.    In the Owens Action, the district court held that it had jurisdiction over defendants and that the foreign-national plaintiffs who worked for the U.S. government were entitled to compensation under 28 U.S.C. § 1605A(c)(3). In the Owens Action, the district court held that support from Iran and Hezbollah was critical to Al Qaeda's execution of the 1998 embassy bombings.

234.    On March 28, 2014, final judgment was entered in the Owens Action against all defendants. Defendants did not note any appeal.

235.    On March 9, 2022, 142 plaintiffs filed a complaint against Defendants arising out of the 1998 East African Embassy attacks in an action captioned *Prudence Bushnell v. Islamic Republic of Iran, et al.* (1:22-cv-00646) in the United States District Court for the District of Columbia (the "Bushnell Action."). On May 4, 2022, three plaintiffs were added.

236.    On March 13, 2023, the district court in the Bushnell Action entered defaults against the Islamic Republic of Iran, Iranian Ministry of Information and Security, and Islamic Revolutionary Guard Corps.

237.    On January 24, 2025, in the Bushnell Action, the district court entered an order which, *inter alia*, limited recovery to plaintiffs who were within the blast radius of the bombing.

238.    Defendants had full, complete and fair opportunities to defend against the claims in the Owens Action and in the Bushnell Action.

239.    It is just and fair that defendants are subjected to offensive collateral estoppel on all claims and defenses, including affirmative defenses.

## COUNT II
## ASSAULT AND BATTERY

240.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 2, 3 and 45-239 of the Complaint.

241.    Defendants, and each of them, intentionally and unlawfully attempted to and did do physical harm to plaintiffs and others, including without limitation serious bodily harm and death.

242.    Defendants, and each of them, intentionally and unlawfully caused harmful and offensive bodily contact to plaintiffs. including without limitation serious bodily harm and death.

243.    As a direct, proximate and foreseeable consequence of Defendants' intentional and wrongful actions, plaintiffs sustained physical harm and offensive bodily contact, including without limitation serious bodily harm and death.

## COUNT III
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

244.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 2, 3, 45-243 of the Complaint.

245.    The conduct of Defendants, and each of them, was intentional, and was planned and calculated and designed to inflict extreme emotional distress on plaintiffs and their surviving spouses as well as on Americans and others.

246.    The conduct of Defendants, and each of them, inflicted extreme emotional distress on plaintiffs, and their surviving spouses, as well as on Americans and others.

247.    The conduct of Defendants, and each of them, was intended to be an act of terrorism directed at Plaintiffs, their surviving spouses, as well as at Americans and others.

248.    The conduct of Defendants, and each of them, was an act of terrorism directed at plaintiffs, as well as on Americans and others.

249.    The conduct of Defendants, and each of them, recklessly inflicted emotional distress on Plaintiffs, their surviving spouses, Americans and others.

250.    The conduct of Defendants, and each of them, was extreme and outrageous and was so outrageous and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

251.    As a direct, proximate and foreseeable consequence of Defendants' intentional and wrongful actions, plaintiffs sustained severe emotional distress.

## COUNT V
## VIOLATIONS OF INTERNATIONAL LAW AND THE LAWS OF NATIONS

252.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 2, 3 and 45-251 of the Complaint.

253.    Acts of terrorism directed at civilians, including acts of terrorism leading to mass civilian casualties, are violations of jus cogens norms, the laws of nations, and the fundamental principles of international law.

254.    Acts of mass violence, designed to inflict, or undertaken in callous and reckless disregard of the likelihood of death, substantial physical injury, pain and suffering, and emotional harm, including fear, terror and humiliation are violations of jus cogens norms, the laws of nations, and the fundamental principles of international law.

255.    The actions of Defendants, and each of them, were acts of mass violence, designed to inflict, or undertaken in callous and reckless disregard of the likelihood of death, substantial physical injury, pain and suffering, and emotional harm, including fear, terror and humiliation.

256.    The acts of Defendants, and each of them, were violations of *jus cogens norms*, the laws of nations, and the fundamental principles of international law, and were heinous and barbarous atrocities which were crimes against humanity.

257.    As a direct, proximate and foreseeable consequence of Defendants' intentional and wrongful actions, plaintiffs sustained severe loss, injury and damage.

## COUNT VI
## VIOLATIONS OF KENYAN CONSITUTIONAL RIGHTS

258.    Plaintiffs adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 2, 3 and 45-257 of the Complaint.

259.    The actions and inactions of Defendants and each of violated the Protection of Fundamental Rights and Freedoms of the Individual, as set forth in Chapter V of the Constitution of Kenya, at sections 70, 72, 74, 75, 76, 80, 81, and 82(2).

260.    As a direct, proximate and foreseeable consequence of Defendants' intentional and wrongful actions, plaintiffs sustained severe loss, injury and damage.

## COUNT VII
## WRONGFUL DEATH AND SURVIVAL – Plaintiffs Mwani, Naivasha and Kimani

261.    Plaintiffs Mwani adopt and incorporate herein by reference as if specifically set forth herein the averments of paragraphs 2, 3 and 45-260 of the Complaint.

262.    Plaintiffs Mwani, Naivasha and Kimani are the surviving spouses of persons killed in the 1998 Nairobi Embassy Bombing.

263.    Plaintiffs Mwani, Naivasha and Kimani were married to such spouses at the time of the 1998 Nairobi Embassy Bombing.

264.    The D.C. Wrongful Death Act permits the spouse or domestic partner of a person who is wrongfully killed to maintain an action and recover damages when the death of a person is caused by the wrongful act, neglect, or default of another person." D.C. Code § 16-2701(a).

265.    The D.C. Survival Act permits the legal representative of a deceased person's estate to bring an action which has accrued in favor of that person prior to his death. *See id.* § D.C. Code 12-101.

266.    The Survival Act and the Wrongful Death Acts provide remedies for tortious conduct that results in death.

267.    On information, belief or reasonable inference, the spouses of Plaintiffs Mwani, Naivasha and Kimani, prior to their deaths, suffered physical injury, emotional injury and pain and suffering because of the intentional wrongful acts of the Defendants, and because of the callous disregard of Defendants and each of them for the injuries their actions would impose on Plaintiffs' spouses.

268.    The wrongful conduct of Defendants, and each of them, caused the death of the spouses of Plaintiffs Mwani, Naivasha and Kimani. As spouses with a direct, close and personal relationship with the decedent, Plaintiffs Mwani, Naivasha and Kimani are entitled to solatium

46

damages because they sustained severe mental anguish, bereavement,  grief and the loss of the decedent's society and comfort, all as a direct, foreseeable, consequential and intended result of  Defendants' conduct.

269.    Plaintiffs Mwani, Naivasha and Kimani should be treated as the representatives of the estates of their deceased spouses.

270.    As a direct, proximate and foreseeable consequence of Defendants' intentional and wrongful actions, Plaintiffs sustained severe loss, injury and damage.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, respectfully request judgment in their favor and against the above-named Defendants as follows:

1.  Compensatory and punitive damages on all counts of the Complaint in favor of Plaintiffs and against Defendants jointly and severally in the amount of six billion three hundred twenty million four hundred seventy-five thousand two hundred ($6,320,475,200.00) dollars, or such other amount as may be proven at trial.

2.  Pre-judgment and post-judgment interest.

3.  An award of costs and fees

4.  Such other and further relief as the Court may deem just and proper.

[the remainder of this page is left intentionally blank]

Respectfully Submitted,

_____ /s/ Philip Musolino
Philip M. Musolino
D.C. Bar No.: 294652
Musolino & Dessel, PLLC
1615 L Street, NW, Suite 440
Washington, DC 20036
Phone: (202) 466-3883
Email: pmusolino@musolinodessel.com